IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN K. RATTLIFF, | ) | Case No. 1:20-cv-01732 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

## I.  Introduction

Plaintiff, Stephen Rattliff, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Rattliff challenges the ALJ's negative findings, contending that the administrative law judge ("ALJ") failed to apply the proper legal standards in weighing two medical opinions on his mental health.  He also argues that the ALJ's ultimate determination of his residual functional capacity ("RFC") – as to his physical limitations – was not supported by substantial evidence.  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Rattliff's application for DIB be AFFIRMED.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## II.    Procedural History

On January 18, 2018, Rattliff applied for DIB.[2]  (Tr. 286).  Rattliff alleged that he

became disabled on October 1, 2017 due to: (1) polyarthritis with positive rheumatoid factor, (2)

acute stress disorder, (3) severe episodes of recurrent major depressive disorder, (4) pain in joints

involving multiple sites, (5) prediabetes, (6) "elevated LFTs," (7) depression, and (8) anxiety.

(Tr. 307).  The Social Security Administration denied Rattliff's application initially and upon

reconsideration.  (Tr. 180-196, 198-213).  Rattliff requested an administrative hearing.

(Tr. 230-231).

ALJ Joseph Rose heard Rattliff's case on June 10, 2019 and denied the claim in a July

24, 2019 decision.  (Tr. 51-61).  In doing so, the ALJ determined that Rattliff had the RFC to

perform light work, with the following limitations:

> [N]o climbing of ladders, ropes, or scaffolds, frequently stooping and crawling, must
> avoid all exposure to unprotected heights and moving mechanical parts, is able to
> perform simple tasks and follow simple instructions, with few, if any, workplace changes,
> superficial and brief interaction with the general public, and occasional interaction with
> coworkers.

(Tr. 55).

Based on vocational expert testimony that a hypothetical individual of Rattliff's age,

experience, and RFC could work in available occupations as a housekeeper, light food service

worker, and light mail clerk, the ALJ determined that Rattliff wasn't disabled.  (Tr. 60).  On June

23, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final

decision of the Commissioner.  (Tr. 3-5).  On August 6, 2020, Rattliff filed a complaint to obtain

judicial review.  ECF Doc. 1.

---

[2] The administrative transcript appears in ECF Doc. 11.

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Rattliff was born on September 2, 1970 and was 47 years old at the time of his alleged

onset date.  (Tr. 198).  He completed high school and college.  (Tr. 71, 308).  Rattliff had no past

relevant work.  (Tr. 59).

#### B.    Relevant Medical Evidence

##### 1.    Medical Evidence of Physical Health

On December 7, 2017, Rattliff was seen by Merryann Werley, NP, presenting with left

hip pain and joint pain.  (Tr. 382-384).  Nurse Practitioner Werley observed that he had a normal

range of movement in his musculoskeletal system but referred him to have an x-ray taken of his

left hip.  (Tr. 384-385).  The ordered x-ray indicated that Rattliff had bilateral degenerative joint

disease in the hips and degenerative disc disease in the lower lumbar region of his spine.

(Tr. 409).

On December 21, 2017, Rattliff had a follow-up appointment with NP Werley to review

the x-ray.  (Tr. 379).  She concurred with the results, and Rattliff also reported that he had had

hand and lower back pain for years.  *Id.*  A physical exam showed that Rattliff had a normal

range of motion in his musculoskeletal system.  (Tr. 380).  She assessed that he had a factor

indicating rheumatoid arthritis and noted that he had elevated liver functions, needed to control

his weight, and was pre-diabetic.  *Id.*

On January 5, 2018, Rattliff had another appointment with NP Werley.  (Tr. 372-373).

He reported that he did not have a history of rheumatoid arthritis or other autoimmune disorders,

but he did have pain in his hands, elbows, and hips, for which he took anti-inflammatory pain

medication regularly.  (Tr. 373).  His back and hip pain were aggravated with activity.  *Id.*  He

was assessed with an elevated liver function results and polyarthritis with a positive rheumatoid factor and referred to have an ultrasound.  *Id.*  His subsequent ultrasound showed that his liver was generally normal.  (Tr. 408).

On February 8, 2018, Rattliff returned to NP Werley for a follow-up visit.  (Tr. 491).  He reported abdominal discomfort.  *Id.*  She assessed that Rattliff had calculus of the gallbladder without cholecystitis or obstruction, and polyarthritis.  (Tr. 493-494).  She referred him to have a cholecystectomy.  *Id.*

On March 1, 2018, Rattliff had x-rays taken of his knees, which indicated that there were no fractures or dislocations, no abnormal calcifications, and his soft tissues were normal. (Tr. 418-419).  On his left knee it was noted that he had a superior patellar osteophyte.  (Tr. 419).

On March 2, 2018, Rattliff had a follow-up appointment with NP Werley, where he reported that he was still experiencing chronic pain in his hands, elbows, and hips.  (Tr. 483). Her assessment did not change.  (Tr. 484-485).

On March 26, 2018, Rattliff had a consultation with rheumatologist Lisa Zickuhr, MD. (Tr. 433).  A physical exam showed that he had good range of motion and no swelling or tenderness across his spine, neck, shoulders, elbows, wrists, knees, and ankles.  (Tr. 435).  He had a diminished range of motion in his hips with a lateral and internal rotation.  *Id.*  In both his hands and his feet there was no evidence of synovitis.  *Id.*  The exam further showed that he had joint pain and swelling, morning stiffness, muscle pain, and weakness.  (Tr. 434).  Dr. Zickuhr's impression was that he had polyarthritis in his hips and knees and suspected arthritis in his back, hands, and feet.  (Tr. 436-437).  Rattliff also was "minimally positive" for rheumatoid factors, but the positivity was of "unclear clinical significance."  (Tr. 437).

On March 28, 2018, Rattliff had x-rays taken of his spine, feet, and hands.  (Tr. 438).
They indicated that he had degenerative disc disease and facet degenerative arthritis in his spine,
mild degenerative changes in both his hands and wrists, and mild degenerative arthritis in the
joints of his big toes.  *Id.*

On April 5, 2018, Rattliff had rehabilitative therapy with physical therapist Steven Ptaff,
PT.  (Tr. 551).  Rattliff reported pain in multiple joints and his lower back.  (Tr. 553).  Ptaff
assessed Rattliff with impairments of overall deconditioning, poor activity tolerance, and
decreased endurance.  (Tr. 551).

On May 22, 2018, Rattliff again had physical therapy with Ptaff, and was instructed on
various exercises.  (Tr. 557).  Rattliff reported that aquatic therapy helped, and his pain was
reduced for a short time after being in the pool, but otherwise nothing had changed.  (Tr. 558).

On May 25, 2018, he had a follow-up appointment with NP Werley.  (Tr. 582).  She
reviewed his symptoms, noting that he had been going to physical therapy for his chronic joint
pain.  (Tr. 582).  She assessed him with chronic pain syndrome, pre-diabetes, polyarthritis, and
metabolic syndrome; and discussed his risk of hypertension and arteriosclerotic cardiovascular
disease, a weight management plan, and the need to quit smoking.  (Tr. 583-584).

On August 28, 2018, Rattliff met with Jayantialal Bhimani, MD, complaining of pain in
his hip, knees, ankles, shoulders, hands, and back.  (Tr. 633).  On physical examination he had a
normal musculoskeletal system, and Dr. Bhimani prescribed him medication for polyarthritis.
(Tr. 633-634).

On September 7, 2018, Rattliff had an x-ray of his chest taken that indicated he had mild
degenerative changes in the thoracic spine.  (Tr. 617).  On September 13, 2018, Rattliff

underwent a laparoscopic cholecystectomy.  (Tr. 626).  No complications occurred and he was diagnosed with chronic calculous cholecystitis.  (Tr. 626-627).

On December 26, 2018, Rattliff had an appointment with Jennifer Heller, NP, to establish care.  (Tr. 638).  On January 23, 2019, Rattliff had a follow-up appointment with NP Heller about his elevated blood pressure.  (Tr. 688).  He was diagnosed with hypertension and instructed to increase his medication dosage.  (Tr. 691).

On April 23, 2019, Rattliff had an appointment with NP Heller for his generalized body pains.  (Tr. 697).  His physical exam was normal, and she gave him medication for the pain. (Tr. 699-700).

### 2. Medical Evidence of Mental Health

On December 8, 2017, Rattliff saw Chadwick Sunday, LPCC, for mental health counseling.  (Tr. 380).  Rattliff reported feeling depressed, overwhelmed for the last six years, trouble sleeping, "feeling generally like a failure," and prior auditory hallucinations.  (Tr. 381). Sunday made a provisional diagnosis of depression and psychosis.  (Tr. 382).

From December 27, 2017 to May 10, 2018, Rattliff met with Sunday for counseling. (Tr. 372, 374, 477, 479, 487, 489, 498, 500, 503, 598).  Sunday's impression of Rattliff's overall condition fluctuated between worsening and improving, but he consistently found him cooperative in his behavior.  (Tr. 372, 477, 480, 488, 489, 498-499, 500-501, 503, 598). Generally, Sunday noted that Rattliff had an array of post-traumatic stress disorder ("PTSD") symptoms and/or depression symptoms, including flashbacks, hypervigilance, anhedonia, anxiety, depressed mood, difficulty concentrating, hopelessness, impaired memory, irritability, tearfulness, and weight gain.  (Tr. 372, 477, 480, 489-490, 499, 503, 598-599).  Sunday also observed that Rattliff generally had a depressed mood, a normal thought process, unremarkable

6

thought content, and normal speech.  (Tr. 372, 477, 480, 488, 490, 499, 500-501, 503, 598-599).

Although Sunday's observations of Rattliff's affect fluctuated, he generally found it appropriate

for the circumstances.  (Tr. 372, 477, 480, 488, 490, 499, 500-501, 503, 598).  Sunday noted

Rattliff's frustrations with his housing situation, dietary restrictions, pain, and his disability

claim.  (Tr. 372, 374, 477, 480, 488, 490, 499, 501, 503, 599).  He only twice noted that Rattliff

had suicidal ideations.  (Tr. 376, 488).

On May 15, 2018, Rattliff met with psychiatrist John DeMott, DO, complaining of

feeling demoralized and insomnia, associated with prolonged homelessness and limited social

support.  (Tr. 595-596).  Rattliff also reported sadness and frustration with his current

circumstances, difficulty sleeping, and poor energy.  (Tr. 596).  Dr. DeMott found that Rattliff's

affect was constricted in range, of adequate intensity, congruent, and appropriate; and that he had

a dysthymic mood; had logical, linear, goal-orientated, and tight associations in his thought

process; good judgment; fair insight; and good cognition.  *Id*.  Dr. DeMott's impression was that

Rattliff had a major depressive disorder.  (Tr. 597).

On May 25, 2018 and June 12, 2018, Rattliff again saw Sunday.  (Tr. 578, 580).  He

again observed that Rattliff had a depressed mood, a normal thought process, unremarkable

thought content, a constricted affect, cooperative behavior, and normal speech.  (Tr. 578-580).

On August 21, 2018, Rattliff had a follow-up appointment with Dr. DeMott.  (Tr. 614).

Rattliff reported relief from his irritability/depression with medication and denied insomnia.

(Tr. 615).  He was still frustrated with his housing and legal situations.  *Id*.  Dr. DeMott observed

that he had a dysthymic mood; a constricted range, adequate intensity, congruent, and

appropriate affect; logical, linear, goal-orientated, and tight associations in his thought processes;

good judgment; fair insight; and good cognition. *Id.* His assessment remained the same. (Tr. 616).

From August 30, 2018 to December 10, 2018, Rattliff continued his counseling with Sunday. (Tr. 613, 641, 643). Sunday's observations remained generally the same. (Tr. 613, 642-644). In his summary of the sessions, Sunday reported that Rattliff felt angry with those in positions of authority for not respecting him, an incident where he felt tempted to act violently, and that Rattliff had severe anxiety based on his inability to obtain medications. (Tr. 613-614, 642, 644). On January 31, 2019, Rattliff met with Sunday to review his substance abuse history including his use of alcohol and crack cocaine in the last six months. (Tr. 684-685).

On February 12, 2019, Rattliff saw Dr. DeMott. (Tr. 682). Rattliff reported that he had been secluding himself at home, was frustrated with not having various basic supports in the community and had recently used cocaine. (Tr. 683). Dr. DeMott observed that Rattliff had a dysthymic mood; had a constricted range, adequate intensity, congruent, and appropriate affect; had logical, linear, goal-orientated, and tight associations in his thought process; good judgment; fair insight; and good cognition. *Id.* Dr. DeMott's assessment remained unchanged. (Tr. 683-684).

On February 20, 2019 and February 25, 2019, Rattliff continued his counseling with Sunday. (Tr. 673, 681). Sunday's observations remained the same. *Id.* He described how they discussed resources or managing addictive tendencies, noting that Rattliff was anxious, depressed, and hopeless due to drug-related circumstances. (Tr. 673, 681-682). On February 20, Sunday noted that Rattliff posed a moderate risk of self-harm. (Tr. 681).

From March 1, 2019 to March 26, 2019, Rattliff met eight times with Alecia Austin, QMHS, a case manager with Frontline Service. (Tr. 704, 707, 709, 715, 717, 762, 772, 774).

Austin counseled him on receiving supportive services, such as housing, obtaining and maintaining his medication routine, and attending medical appointments.  (Tr. 705, 708, 710, 716, 763, 773, 775).  In their first meeting, Rattliff reported that he perceived himself as "people's go-to" and disclosed his history of aggression, violence, and trauma, which he attributed as the cause of his nightmares.  (Tr. 763).  Later, he also shared feelings of anxiety about running out of medication, and he shared issues and stress around interpersonal problems and attempting to distance himself from situations.  (Tr. 773).  On one occasion, Austin also reported that he grew irritable and aggressive towards the staff.  *Id.*

On March 28, 2019, Dr. DeMott evaluated Rattliff for PTSD, noting that his motor activity was normal, and he was engaged, had an irritable affect, had an organized thought process; had intact judgment, and partial insight.  (Tr. 742-744).  He assessed Rattliff with PTSD and an alcohol use disorder.  (Tr. 747).

On March 28, 2019, Rattliff also met with Austin.  (Tr. 784).  He reported being interesting in obtaining pain medication and wishing to obtain new housing to distance himself from "users" in the building.  (Tr. 785).  He reported one instance where he was provoked by another individual and decided to walk away.  *Id.*  At another meeting that day, Austin reported that he seemed joyful and engaged on leaving a psychological appointment, but then grew restless, clenched his jaw, and made mild hand gestures in expressing his disappointment with his prior work history in comparison to his present lack of finances.  (Tr. 786-787).

On April 12, 2019, Rattliff again met with Dr. DeMott for management of his medication.  (Tr. 748).  Rattliff reported that he was assaulted and robbed the prior Wednesday and was thinking about returning to work but was trying to get basic supplies for his home.  *Id*.  He also reported that he had "cut back" on the substances he used and was not interested in

alcoholics anonymous meetings.  *Id.*  Dr. DeMott noted his motor activity was normal and he was engaged during their meeting.  (Tr. 749).  He also noted that Rattliff had a dysthymic mood, full affect, tangential thought process, partial insight, and intact judgment.  (Tr. 749-750).  His diagnosis of PTSD and alcohol use disorder remained the same.  (Tr. 753).

From April 12, 2019 to April 24, 2019, Rattliff met with Austin seven times.  (Tr. 723, 725, 790, 794, 796, 802, 804).  She indicated that they discussed Rattliff's struggles with maintaining his sobriety, her assistance with various social interactions, and his need to prioritize his housing and medical treatments.  (Tr. 724, 726, 791, 795, 797, 803, 805).

On May 6, 2019, Rattliff again met with Dr. DeMott, for continued treatment of his PTSD.  (Tr. 754).  Dr. DeMott observed that Rattliff had normal motor activity, was engaged, had a euthymic mood, had a full affect, had an organized thought process; had intact judgment; and had partial insight.  (Tr. 755-756).  Rattliff reported that he had not used cocaine for a week, described an eight-year period of sobriety, and was optimistic about the future.  (Tr. 758). Dr. DeMott's diagnostics did not change.  (Tr. 759).

C.     **Relevant Opinion Evidence**

1.     **Medical Source – John DeMott, DO**

On May 5, 2019, Dr. DeMott, Rattliff's treating psychiatrist, completed a medical source statement on Rattliff's mental health functioning.  (Tr. 812-813).  He found that, as to Rattliff's ability to understand, remember, or apply information, he had marked impairments in his ability to: recognize a mistake and correct it, identify and solve problems, sequence multi-step activities, and use reason and judgment to make work-related decisions.  (Tr. 812).  Rattliff either had no impairments or only mild impairments in his ability to understand and learn terms, instructions,

or procedures; follow one or two step oral instructions to carry out a task; describe work activity to someone else; and ask and answer questions and provide explanations. *Id.*

As to Rattliff's ability to interact with others, Dr. DeMott found that he had marked impairments in cooperating with others; handling conflicts with others; responding to requests, suggestions, criticisms, correction and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness. *Id.* Dr. DeMott also found that Rattliff had a moderate impairment in his ability to ask for help when needed, a mild impairment in his understanding and responding to social cues, but no impairment in stating his own point of view of initiating or sustaining conversation. *Id.* As to his ability to concentrate, persist, or maintain pace, Dr. DeMott found marked impairments in every category, except for a moderate impairment in initiating and performing a task that Rattliff understood and knew how to do. (Tr. 813).

As to his ability to adapt or manage himself, Dr. DeMott found marked impairments in Rattliff's ability to adapt to changes and distinguish between acceptable and unacceptable work performance. *Id.* He also found moderate impairments in his ability to respond to demands, manage his psychologically based symptoms, set realistic goals, and make plans for himself independent of others. *Id.* He found only mild impairments, however, in maintaining personal hygiene and attire and being aware of normal hazards and taking personal precautions. *Id.*

### 2.     Medical Source – Chadwick Sunday, LPCC

On June 14, 2018, Chadwick Sunday, Rattliff's treating mental health counselor, completed a medical source statement on Rattliff's mental health functioning. (Tr. 566-567). He opined that Rattliff had extreme impairments in his ability to describe work activity to someone else and ask and answer questions and provide explanations; marked impairments in his ability to

11

use reason and judgment to make work-related decisions; and mild impairments in his ability to identify and solve problems, but was otherwise unimpaired in his understanding, remember, or applying information.  (Tr. 566).  In his ability to interact with others, Sunday opined that Rattliff had extreme impairments in his ability to handle conflict with others, respond to requests, suggestions, criticisms, correction, and challenges; and keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; marked impairments in his ability to ask for help when needed and state his own point of view; moderate impairments in his ability to cooperate with others and understand and respond to social cues; and mild impairments in his ability to initiate or sustain conversations.  *Id.*

Additionally, Ratliff was opined to have extreme impairments in nearly every category in his ability to concentrate, persist, or maintain pace, except for a mild impairment in changing activities or work settings without being disruptive and no impairments in his initiate and performance of tasks that he understood and knew how to do.  (Tr. 567).  In his ability to adapt and manage himself, Rattliff also had extreme impairments in nearly every category, except for a marked impairment in maintaining personal hygiene and attire appropriate to a work setting, a moderate impairment in his ability to be aware of normal hazards and take appropriate precautions, and mild impairments in distinguishing between acceptable and unacceptable work performance.  *Id.*

### 3. Medical Source - Dariush Saghafi, MD

On March 1, 2018, Rattliff saw Dariush Saghafi, MD, for a manual muscle test.  (Tr. 422, 424).  The test indicated that Rattliff had normal motor movement across all his upper and lower extremities and his left and right hands.  (Tr. 422).  He also had normal range of motion across his body.  (Tr. 423-424).  Dr. Saghafi prepared a report on his examination of Rattliff.  (Tr. 425).

He observed that Rattliff was not in acute distress, ambulated with his arms abducted from his body, favored his left side compared to his right, and had no signs of swelling in his finger joints or ulnar deviation or hyperflexion of the metacarpophalangeal joints. *Id.* He reported that Rattliff's motor functioning was normal, he was sensitive to light touch and pin pricks, and there were no gross deformities in his spinal column, although he noted mild to moderate percussion tenderness over the lumbar vertebral bodies. (Tr. 426-427). He also noted that Rattliff had an antalgic gait on the right favoring the left leg and his arm swing was asymmetric. (Tr. 427). Generally, he assessed that Rattliff could bend, walk, and stand for about a quarter of a mile, lift, push, and pull sufficiently to perform daily activities, lift and carry five to ten pounds, and was able to understand the environment and communicate satisfactorily. *Id.*

### 4. Medical Sources – State Agency Examiners

On May 7, 2018, Karla Delcour, PhD, offered opinions on Rattliff's mental health based on her review of medical records. (Tr. 188). She found that he had mild impairments in his ability to understand, remember, or apply information; and moderate impairments in his ability to interact with others; concentrate, persist, or maintain pace; and adapt and manage himself. (Tr. 187, 192-193). On reconsideration, Patricia Kirwin, PhD, made similar findings, but concluded that Rattliff had moderate limitation in every category of functioning. (Tr. 204, 209-210).

On May 7, 2018, Rannie Amiri, MD, opined about Rattliff's physical limitations based on a review of his medical records. (Tr. 191). He found that he had various exertional, postural, and environmental limitations. (Tr. 190-191). As relevant here, he concluded that Rattliff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, was similarly limited in pushing and pulling, and could stand, walk, or sit for about 6 hours in an 8-hour

workday.  (Tr. 190).  He also concluded that Rattliff did not have any manipulative limitations.

(Tr. 191).  On reconsideration, Venkatachala Sreenivas, MD, concurred with Dr. Amiri's overall

limitations and those of particular relevance.  (Tr. 206-208).

### D.  Relevant Testimonial Evidence

Rattliff testified at the hearing.  (Tr. 70-79).  He stated that he stopped working in 2017

because he had a lot of pain in all of his joints, his lower back, and his hips.  (Tr. 72).  It became

hard for him to sit, stand, and walk long distances.  *Id.*  He had been diagnosed with polyarthritis,

with a positive rheumatoid factor, and osteoarthritis.  *Id.*  He was also pre-diabetic, which he was

controlling through diet.  (Tr. 73).  He had been sober from alcohol and cocaine for "a couple of

weeks."  *Id.*  He had been feeling desperate about his financial situation because he could no

longer do his prior work.  (Tr. 74).  He also received food stamps.  (Tr. 78).

## IV.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

14

re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it

is not necessary that this court agree with the Commissioner's findings," so long as it meets this

low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-

guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the

court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d

875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996));

*accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1,

2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or

merely overlooked.").

## B.    Step Four: Evaluation of Opinion Evidence

Rattliff argues that the ALJ failed to articulate the "level of persuasiveness" of

Mr. Sunday's and Dr. DeMott's opinions "in terms of supportability and consistency."  ECF

Doc. 13-1 at 17.  Specifically, Rattliff asserts that the ALJ explained that he found Sunday's and

Dr. DeMott's opinions were *not supported* by evidence in the record but didn't state whether he

found the opinions persuasive and/or to what degree.  ECF Doc. 13-1 at 19.  Further, Rattliff

asserts that the evidence in the record supported and was consistent with Sunday's and

Dr. DeMott's opinions, the opinions were consistent with each other, and the ALJ failed to discuss records reporting depression/mood symptoms.[3]  ECF Doc. 13-1 at 20-21.  Thus, Rattliff contends that the ALJ's decision included an insufficient discussion to explain how he weighed the opinion evidence and why.  ECF Doc. 13 at 21-22.  The Commissioner disagrees.  ECF Doc. 14 at 9-15.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).  In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).  Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).  Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other medical and nonmedical sources, whereas supportability concerns the existence of relevant objective medical evidence supporting explanations given by the medical source to support the limitations assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).  Although the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the

---

[3] Rattliff also asserts that confusion arises because of the ALJ's simultaneous determinations that the evaluating sources were "persuasive" and "somewhat persuasive," but Rattliff does not challenge any of the evaluating sources' opinions or that any specific harm arose because of the confusion and, thus, the issue is waived.  *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 806 n.8 (6th Cir. 2018) (holding that an argument was properly preserved because it was not raised in a "perfunctory manner" (internal quotation marks omitted)); ECF Doc. 13-1 at 17-18.

ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

### 1.    Chadwick Sunday, LPCC

The ALJ applied the proper legal standards and reached a decision supported by substantial evidence in determining that Sunday's opinions were not well supported.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Here, despite Rattliff's assertion to the contrary, the ALJ did not err by not describing the weight assigned to Sunday's opinion in terms of persuasiveness.  ECF Doc. 13-1 at 19.  At minimum, the ALJ needed only to address how he weighed the opinion in terms of consistency and supportability and, from context, his decision allows the court to build a logical bridge and reasonably infer that, given the lack of supportability, the ALJ found Sunday's opinion to be unpersuasive.  20 C.F.R. § 404.1520c(b)(2); *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79; *Fleischer*, 774 F. Supp. 2d at 877.  Specifically, the ALJ explicitly stated that Sunday's opinions were "not well supported" and went on to describe the flaws he saw that caused him to discount the opinion.  (Tr. 54).

Additionally, the ALJ addressed both the supportability and consistency of Sunday's opinion, as required by the regulations.  20 C.F.R. § 404.1520c(b)(2).  The ALJ explicitly concluded that Sunday "only" supported his medical source statement with a statement that Rattliff suffered from depression, resulting in him struggling to care for himself and sustain work.  (Tr. 54).  Although not an extensive discussion, the ALJ met the regulation's requirement by addressing the degree of explanation given by Sunday in support of his opinion and implicitly noting the lack of other objective medical evidence.  *See* 20 C.F.R. § 404.1520c(c)(2).  The ALJ further considered the supportability of Sunday's opinion, stating that it was inconsistent with his

own treatment notes that documented normal thought process and speech and Rattliff's general cooperative demeanor – which the ALJ found inconsistent with Sunday's opinion that Rattliff was seriously limited in his concentration, persistence, and pace.  And in the next paragraph of the ALJ's decision, he contrasted the opinion of Karla Delcour, PhD, who evaluated Rattliff's mental condition based on the evidence of record, finding her much less extreme limitations to be "consistent with the weight of the objective and subjective evidence of record document." (Tr. 54-55).  Although not discussed in a single paragraph, it is evident that the ALJ made a supportability and consistency evaluation concerning the opinions of Chadwick Sunday, thus fulfilling the regulatory requirement.  20 C.F.R. § 404.1520c(b)(2).

Substantial evidence supports the ALJ's determination that Sunday's opinion was not well supported.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (1) Rattliff's reported cooperation with treating sources and being people's "go-to" person because of his "friendly" demeanor (Tr. 372, 477, 480, 488, 490, 501, 503, 579-580, 599, 613, 642, 644, 673, 681, 763); (2) the consistent reports of his normal, organized, linear, logical, and goal-orientated thought process (Tr. 372, 477, 480, 488, 490, 499, 500-501, 503, 578-580, 596, 598-599, 613, 615, 642-644, 673, 681, 683, 744, 756); and (3) consistent reports of his good or intact judgment (Tr. 596, 615, 683, 744, 749, 756).  Each of these findings from Sunday's own treatment notes was inconsistent with the extreme limitations he proposed.  *Biestek*, 139 S. Ct. at 1154.  From such evidence, a reasonable person could conclude that substantial evidence supported the ALJ's determination that Rattliff had only moderate limitations in his ability to interact with others; his concentration, persistence, and pace; and in adapting and managing himself.  *O'Brien*, 819 F. App'x at 416.

Moreover, although Rattliff contends that the ALJ failed to address the record evidence indicating he was depressed, the ALJ's consideration of Sunday's and other medical sources' treatment notes, in addition to the ALJ's consideration of Listings 12.04 and 12.05 for mental impairments, shows that he was aware of and considered the Rattliff's depression. *See Davidson v. Berryhill*, No. 3:16-CV-2621, 2017 U.S. Dist. LEXIS 172519, at *47 (N.D. Ohio, Aug. 28, 2017) (finding that the ALJ need not discuss every piece of evidence in the record but may not fail to acknowledge evidence that potentially supports a finding of disability); ECF Doc. 13-1 at 20-21; (Tr. 54-55, 57-59).  Thus, even though the ALJ failed to specifically articulate Rattliff's major depressive disorder as a severe or non-severe condition, Rattliff suffered no prejudice, because the ALJ nevertheless considered it in his description of what the various providers' records noted. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009). Accordingly, the ALJ's decision to discount Sunday's opinion fell within the Commissioner's "zone of choice" and should be affirmed.  *Mullen*, 800 F.2d at 545.

### 2.     Dr. DeMott

The ALJ also applied the proper legal standards in evaluating Dr. DeMott's opinion because he followed the regulation and articulated findings regarding the opinion's lack of supportability.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  As with the ALJ's handling of the opinions of Chadwick Sunday, although the ALJ expressly evaluated the persuasiveness of Dr. DeMott's opinion, he failed to state that he found it to be "unpersuasive."  But that failure was not harmful error because the ALJ found it to be unsupported.  And the ALJ expressly explained why.  (Tr. 59)  Once an ALJ determines that a medical source opinion is unpersuasive because it was not supported by the source's own examination findings – and provides a coherent explanation for why – any failure to use a particular word – such as "unpersuasive" is

19

necessarily harmless.  Lack of supportability alone is a basis for finding a source opinion to be unpersuasive.  *See Okonski v. Comm'r*, No. 3:20-cv-1614, 2021 U.S. Dist. LEXIS 204564, *30 (N.D. Ohio October 25, 2021); *Kearns v. Comm'r*, No. No. 3:19-1243, 2020 U.S. Dist. LEXIS 95697 (N.D. Ohio Feb. 3, 2020)(Mag. Judge Greenberg)(*adopted by Kearns v. Comm'r of Soc. Sec.*, 2020 U.S. Dist. LEXIS 95067 (N.D. Ohio, June 1, 2020); *Baca v. Saul*, No. 20-225, 2021 U.S. Dist. LEXIS 70814, at *17-18 (D. N.M. Apr. 13, 2021) (stating that an ALJ's supportability finding would have been sufficient to reject a source's opinion even if the consistencies the ALJ discussed were not).  Though imperfectly expressed, this was sufficient to satisfy the requirement of the regulation.  20 C.F.R. § 404.1520c(b)(2).

The ALJ explained his supportability analysis by stating that he found Dr. DeMott's conclusions to be inconsistent with his own treatment notes.  (Tr. 59).  This directly followed the regulation.  20 C.F.R. § 404.1520c(b)(2)..  That regulation also required the ALJ to discuss the "consistency" of Dr. DeMott's opinion.  "[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions."  *Id.*  And the regulation describes "consistency" to be an evaluation of how consistent a medical opinion is with evidence from other medical and nonmedical sources.  *Id.*  Here, the ALJ's discussion of "persuasiveness" only mentioned that Dr. DeMott's "extreme conclusions" were "not supported" by his own treatment records.  (Tr. 63).  The ALJ did not expressly discuss whether Dr. DeMott's opinions were consistent with evidence from other medical or nonmedical sources.  This was error.  And Rattliff claims the error was harmful because Dr. DeMott's opinions *were* consistent with the opinions of Counselor Chadwick Sunday.  ECF Doc. 13-1 at 20-21.

I recommend the court reject Rattliff's argument on this point.  First, as noted above, once an ALJ rejects a medical source opinion on the grounds it is unsupported, he has a basis

upon which to conclude the opinion is unpersuasive.  *Okonski*, 2021 U.S. Dist. LEXIS 204564, at *30.  And it is apparent that the ALJ found the opinions of both Dr. DeMott and Counselor Sunday to be unsupported.  It would be a perversion of social security law to fault an ALJ for failing to credit two *unsupported* medical source opinions because they were *consistent* with each other.  Further, the ALJ's decision must be read as a whole and with common sense. *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  It is apparent that the ALJ credited evidence from other medical sources.  (*See* Tr. 54-55, 58-59 discussing evidence from Karla Delcour, PhD).  The ALJ cited normal findings by Dr. Delcour, which were necessarily inconsistent with the "extreme" and "marked" limitation opinions expressed by Dr. DeMott.  *Id.*  Thus, although the ALJ's decision could have better tracked the rubric of the regulation, any failure to provide an express discussion of "consistency" was harmless error and provides no basis for remand.

"No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (citation omitted). *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (citation omitted).  Reading the ALJ decision in this case as a whole leads to the inescapable conclusion that sending the case back to the Commissioner because the ALJ did not use the words "unpersuasive," or "consistency" would be a useless formality.

I recommend that Rattliff's arguments regarding the ALJ's handling of the medical source evidence be rejected.

### C.        Step Four: Ultimate RFC Determination of Physical Limitations

Rattliff argues that the ALJ erred in failing to find additional walking, standing, and lifting restrictions in his RFC. ECF Doc. 13-1 at 22. Rattliff asserts that "light work" requires lifting no more than 20 pounds, lifting/carrying up to 10 pounds frequently, doing "a good deal of walking and standing," and (if sitting) pushing and pulling. ECF Doc. 13-1 at 23. He asserts that he couldn't perform light work because: (1) his hip, back, and feet issues precluded him from being on his feet for six hours in an eight-hour workday; (2) evidence showed limited range of motion in his hips and gait issues; and (3) his upper extremity symptoms limited him to lifting only five to ten pounds. ECF Doc. 13-1 at 23-25. Further, Rattliff argues that the ALJ erred by failing to discuss in his written opinion x-rays of his hands/wrists and findings that he had chronic swelling in his fingers. ECF Doc. 13-1 at 25. Thus, Rattliff contends that the ALJ failed to build an accurate and logical bridge between the evidence and the result in evaluating his RFC. ECF Doc. 13-1 at 25. The Commissioner disagrees. ECF Doc. 14 at 15-18.

The RFC, as determined at Step Four of the sequential evaluation process, is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ applied the proper legal standards and reached a decision supported by substantial evidence in determining the walking, standing, and lifting restrictions in Rattliff's

RFC. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  First, Rattliff only asserts that the ALJ did

not consider his hand/wrist x-rays and the swelling in his fingers, contesting the ALJ's weighing

of the evidence related to his hips, feet, back, limited range of motion, and upper extremities.

ECF Doc. 13-1 at 23-25.  However, the ALJ noted Rattliff's complaints of polyarthritis, pain in

multiple joints, and general arthritis in his feet by considering the impairments for major joint

dysfunction and spinal disorders and noting an x-ray indicating he had degenerative joint disease

and degenerative disc disease, his positivity for a rheumatoid factor, and his inflammatory

arthritis.  (Tr. 53-54, 56).  Moreover, the ALJ was not required to note every piece of evidence

he considered.  *See Davidson*, 2017 U.S. Dist. LEXIS 172546;.  Because the decision reflects

that the ALJ considered the limitations in Rattliff's hips, back, feet and upper extremities, the

ALJ applied the proper legal standards in reaching Rattliff's RFC.  SSR 96-8p, 1996 SSR

LEXIS 5.

Substantial evidence supports the ALJ's determination that Rattliff was limited to light

work with regard to impairments stemming from his hips, back, and feet, his limited range of

motion in his hips, his gait issues, and his upper extremities.  42 U.S.C. § 405(g); *Rogers*, 486

F.3d at 241.  Specifically, such evidence includes: (1) treatment notes indicating that he had a

normal range of motion in his hips and could walk, although his gait was "antalgic" (Tr. 380,

384-385, 422-427, 435); (2) treatment notes indicating that he had a normal range of motion or

no pain across his back and feet (Tr. 379-380, 384-385, 422-424, 426-427); and (3) treatment

notes from his physical therapist that did not indicate any limitations in his upper extremities

(Tr. 551-553, 557-558).  *Biestek*, 139 S. Ct. at 1154.  Rattliff asserts that these records show that

he had greater limitations based on his polyarthritis, but even if the records created a

preponderance of the evidence supporting greater limitations, the ALJ's determination was

supported by sufficient evidence that a reasonable person could conclude there was substantial evidence supporting it.  *O'Brien*, 819 F. App'x at 416; ECF Doc. 13-1 at 23-25.  As a result, the ALJ's RFC as to those physical limitations must be affirmed.

## V.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported in all respects by substantial evidence, I recommend that the Commissioner's final decision to deny Rattliff's claims be AFFIRMED.


Dated: October 29, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).